Good morning, Your Honor. May it please the Court. This case is about the wrongful conduct of a triple fiduciary, including claims of breach of fiduciary duty and conversion of valuable assets. Plaintiffs also seek the recovery of two of those converted assets from the BGA or Sagan defendants. The fiduciary is Defendant Nick Clainos. The District Court erred in granting summary judgment because as to each claim against each defendant, there were disputed issues of fact. The nature and the timing of the tortious conduct, including the time of conversion, is best understood in terms of the four converted items, and I identify those for the Court at this time. The poster copyrights, the Fillmore trademark, the poster scrapbooks, and the 100 sets of posters or bills stash. Each one of these items was not disclosed to the plaintiffs as beneficiaries of the Bill Graham estate. I want to first talk about the poster copyrights, and I want to go back in time one step so that we understand a little bit more about its history and how it came about. I think it also identifies for us the disputed issues of fact. There are 325 poster copyrights in that Bill Graham was involved in. The ones at issue here were registered in the name of Bill Graham at the time he died. Another type of poster registration, which will demonstrate the nature of the disputed facts, are the Fillmore Corporation registrations. The Fillmore Corporation registrations had copyright Fillmore Corporation, were registered in the name of the Fillmore Corporation, and they were registered in the same two years that the Bill Graham registrations occurred. They were also done by the same person at the company. Now, the Bill Graham posters date back to 1965, and they go, and of the, and they divide really in 2 categories, or 3 really. The first category are posters that predated the existence of any corporation, and that is, and of those, that's about 55 poster copyrights. Of those, 6, 9 of those, excuse me, 9 of those were ultimately registered in the name of Bill Graham, and these predate the existence of any corporation. In the middle are another series of posters, and then we fast forward to the last approximately, I believe it's of 55. I'm going to have to double check my count, but about approximately the last 55 posters. And of those, they are, they were registered within the 5-year presumption of publish, of when they were published, also in the name of Bill Graham. How do we know that the poster copyrights belonged to, were owned by Bill Graham at the date of his death, in October, on October 25, 1991? We have to go back one step and look at what happened in 1990 and 1991, and the record has these, all of this information. The, the, Bill Graham contemplated in 1990 and 1991 making a donation to the Oakland Museum. He was making a personal donation, he was consulting with a lawyer by the name of Richard Green to make that personal donation, and he was seeking a personal tax deduction. That donation would have included poster stock, and there was some discussion of whether it also had to include the poster copyrights, because they would have to be combined in order to achieve the tax reduction goal, or tax deduction goal. On October 17th, less than 10 days before Bill Graham died, Richard Green exchanged memos with his law partner in which he wrote, the poster copyrights are mostly owned by Bill Graham, mostly owned by Bill Graham, not the company, and he was talking as the lawyer for Bill Graham for a tax deduction. Ten days later, Mr. Graham dies tragically in an, in a helicopter accident. The executor of the estate, Nicholas Klanos, one of the defendants here, assumes the role as executor as selected by Mr. Graham, and also as the trustee for the plaintiffs, David and Alex Graham. Fast forward a few years later, a few weeks, about six weeks later, on December 9th, 1991, Mr. Green, now serving as the lawyer for the executor of the estate, Mr. Klanos, interviews, at Mr. Klanos' request, interviews and does further investigation about the assets of the estate, and he says that he's now made a determination, he's changed his mind, that the copyrights, even though they're registered in the name of Bill Graham, and they were registered, all 325 of them in his name, that they belong to the corporation, and he lists some factors. Now, I am not suggesting this court, and I did not suggest to the district court, that these facts that I'm about to list for you are dispositive of the issue. What I am suggesting to this, to this court, and we, we submitted to the district court, is that these are disputed facts. That these, that the, that the facts of how these posters came into existence, what, who, who commissioned the art? Was it Bill Graham wearing his hat as an individual, or was it Bill Graham wearing his hat as an owner of a corporation? Those facts were disputed, and there were disputed facts on each issue. The artist, 3 of the artists testified, who, 3 of the artists who comprised a substantial number of the disputed 325 posters, each testified that the, that, that he met with them, that he personally met with them, that he personally oversaw their, their, their work, approved the artwork, had input into what it would be like, negotiated the fee for the work, paid a set fee for each posters of approximately $100, and said, you must put on the poster, copyright Bill Graham. I call the court's attention, the, the judge's attention back to the Fillmore Corporation. In the, in the instance of the Fillmore Corporation, Mr. Graham instructed that the, the artist write copyright Fillmore Corporation. He instructed copyright Bill Graham, the posters were to be delivered, he said, and he said, and the, and the artist all agree, Bill Graham told them, I, Bill Graham, own the copyright. There is no evidence of the 9 posters that predate the existence of a corporation of any assignment of those copyrights. There is, and the presumption took effect when he put the mark of copyright Bill Graham on the poster. There is no evidence of any of the copyrights through, that were registered in the name of Bill Graham, that they were ever assigned until August 30, 1995. I want to have the court visit what happened there. We've already been to the 9th Circuit on this assignment in part, but we revisit it now because we went back, the, the court when we were first last here, suggested that we, that the plaintiffs had stated sufficient facts, sufficient disputed facts to proceed. We've now gone and filled in that record with many more disputed facts that deserve to go to a trier of fact. On August 30, 1995, Mr. Klainos, as the executor, signs a, an assignment, assigning transfer, purporting to transfer the assets, two assets, or two sets of assets, the poster copyrights and ultimately the trademarks. Some of those poster copyrights are attached as an exhibit, but the document itself doesn't say the attachment and list is the, comprises the total. It simply says all of the copyrights registered in the name of Bill Graham will be transferred now to the corporation. The question arises whether or not that transfer was a valid transfer at the time. We must go back a step to determine that. First, the assignment that was signed, there's no dispute, it was signed on August 30th, 1995, was backdated to August 1st, 1995. On August 8th, 1995. Was there anything nefarious about that? I thought that was just to comply with the terms of the contract. What's nefarious about that? I don't think there was anything that it was complying with a contract. It was a date merely affixed to the document. I do believe it is evidence of the, it's relevant. To me, it, we can only say that the document was, whether backdated or not, the attempt to assign occurred on August 30th, 1995. It did not occur on August 1st. And the relevance of that, Your Honor, I believe is that on August 8th, 1995, the probate court issued its final order. And in that final order, it stated that all assets of the estate were being distributed to the beneficiaries, and any assets not identified and not yet discovered, in other words, any after-discovered assets, would proceed and go on a pro rata basis to each of the beneficiaries. I submit, Your Honor, that as of August 8th, 1995, all of the assets in dispute here passed on a pro rata basis to the beneficiaries of the estate. Fifty-five percent of which would belong to the plaintiffs at this time. And how does, what have they been cheated of, just in practical terms? They've been cheated, Your Honor, of the right and title of the 325 poster copyrights. And in that regard, Your Honor, they were not, when Mr. Klainos signed that assignment, he had nothing to assign. It already belonged. At that point on August 8th, that asset passed, passed to the beneficiaries. They as well, Your Honor, to answer your question more fully, they did not receive the poster copyrights, which I will address independently. They did not receive the 100 sets. They did not receive the poster, the Philmark trademark registration, which was also registered in Mr. Graham's name. There are disputed, I come back, Your Honor, that there are disputed facts as to each one of these issues, but each of these items had value. The poster copyrights would, had this matter gone to trial, would have been assigned by experts who were, expert discovery was underway at the time this hearing took place, would have been assigned a value and it had at loss. The right to exploit those copyrights would also be there. The poster, oh, yes. May I ask you, did the Philmark trademark survive the sale, the sale of the company? The Philmark trademark has a very interesting history to it, Your Honor. Answer my question first, and then you can tell me the history. Well, I think it, I apologize. Give me a yes or no, and then you can explain. I'm sorry, Your Honor, can I hear the question again? My question was, did the Philmark trademark survive the sale of, survive the sale of the company? In 19, by the beneficiaries, there were several sales. Yes, it did. It survived the sale. It was registered in the name of Bill Graham. It belonged to the beneficiaries at the time that they sold their shares of the Bill Graham companies to the corporation. Therefore, when they proceeded, and Alex and David Graham in particular, proceeded into the new company as 20 percent shareholders and were in a position to license, had they been told that they had title to that trademark, would have been in a position to license it or otherwise exploit it as operators and owners of a, of a business promoting that type of trademark. So it didn't just evaporate, Your Honor. How do we, what do we do with the fact that they were, they benefited from the sale and actually received a pretty significant sum of money? How does that all play out in your analysis? I think it plays out in two ways, Your Honor. The first way is that we cannot say that fiduciary law will be turned on its head, and if a, if a fiduciary happens to preside over a sizable estate, that that fiduciary can escape responsibility for not passing forward assets and for concealing them and engaging in self-dealing for his own personal benefit as to those assets merely because the beneficiaries of the estate inherited a great deal of money or perhaps sold those businesses. The sale of the business, which I think has been the subject of quite a bit in the that Bill Graham partnership and then sold to a company called SFX. Right. They were, they certainly received compensation, as did everyone who was a shareholder of the Bill Graham partnership. Their, their interest in that is no different. Now, the question becomes, was the, were these assets part of the sales price? We have disputed evidence in the record on that, Your Honor, and I think that perhaps more directly answers your question. The, Frank Rockwell, among others, testified, and he was the CFO of the company and, and was the key, the point man for the negotiation of the sale to SFX, said that the archives, whether we're talking the, the commercial archives, if we're calling that a part of it, that they were not included in this, in the sales price. Well, I'm, I'm curious as to how the trademark could be separate from the concert promotion business. It wouldn't have been separate. Had, Your Honor, I would submit that had Alex and David Graham known that they owned that asset, had their fiduciary said, guess what, you own, your father owned it and now you own it, they were 20, they were 10% partners each in a concert promoting business as of 1995. Or I'm, yes, as of 1995. So your argument is that when the business was sold, they should have gotten a larger share of the trademark because of the trademark ownership? No, Your Honor. Because I, I still don't see how you're separating out the trademark from the business. I understand the Court's question. It's not separating from the business. The, the, the owners of the registration would have a right to move that asset into corporations that are promoting it, whether it be that business or they move to a different business or they establish another business. They could have formed another entity. It did not have to evaporate in the way it did. What happened. Would it be renamed? It could have been. Well, I don't know that the trademark would have been renamed, but the holding company for the asset, for the trademark asset, could have been renamed. In fact, it was renamed. SFX bought it. So could I come back to this issue of, that Judge Bivey was getting at in terms of the practical damages that are in play here? If, if I understand it correctly, they differ depending on the group that, of, of product you're talking about. Right. So in the poster copyright claim, your claim is they only received 20 percent of the stock as opposed to what they would have been entitled to 55 percent if it had passed through the estate. Do I, do I have that right? No, Your Honor. Actually, with due respect, the, we are not contending that the sales proceeds have anything to do with these assets. In the documents and in the evidence before the district court is that there were basically commercial archives and there was personal memorabilia. The personal memorabilia consists and includes the four concealed assets. Those assets at all times belong to the beneficiaries. It had nothing to do with any of the sales of the corporation. They were ultimately sold as a separate asset. They were carved out of when Clear Channel had it many years later. They were sold as a, they were put into a separate entity and sold to, well, at least three of the assets, we believe, were sold to Mr., to the BGA defendants and Mr. Sagan. But we are not, we are, we are, we are saying that assets that belonged to the beneficiaries were sitting, and if you could imagine, they were sitting in a, in a, in a, in a sealed locker passing through, passing through. The plaintiffs never knew that they existed. And as the corporations were sold, and after the corporations, so long after all of those transactions are gone and people have moved on and everyone that they dealt with has no longer with the company, they find out that there were copyrights belonging to their father at the time of his death that are in, that are, that someone else is asserting control and ownership over, which would be the BGA defendants. But they did receive money as a result of the sale of these, of these corporations, right? I mean, there's a series of sales. They received money as a result of that. They did receive money from the sale of the businesses. They, they sold their interest in the business. Right. And they sold, but, but the assets were not part of those purchase prices. There's no, they were never appraised. They were never included. No one ever said, and the testimony in the record is clear, that, that no one was purchasing the archives. They were purchasing the promotion business when those successive sales were coming. The archives were sort of sitting on the sideline as a group, but within that were concealed assets that had already passed in title to the plaintiffs. So the archives were given, were just given away? No, Your Honor. They were, they, they were known and viewed as a sort of an unprofitable, well, at least the commercial part of the archives, this large poster stock. So they, they had been valued implicitly then in the sale of the companies. Well, there was. I'm a little, I'm a little confused. Yes. Here's where I'm confused, because you tell us, we know that the companies were sold. Yes, Your Honor. We know that there was an assignment. So presumably all of the intellectual property that you're concerned about here went with the companies when they were sold. Yes, Your Honor. Those companies were, were, were valued. There was a value placed on them, a dollar value, from which your clients received some money. Yes, Your Honor. But now you're telling, now you're telling me that, that they were never separately valued. So is your contention then that they, that they really weren't valued when those companies were sold, and so they were just sort of given to them later on? No. The, the archives were, no, the archives actually did not receive, there, there, well, there are, let me see if I can go back. On the 706 tax return, we see a, a, a small reference to memorabilia valued at about $325,000, $340,000, I think. After that, we don't see any value being affixed to the archives until we see a sale to Mr. Sagan in 2002. But there is testimony in the, Mr. Rockwell, the point person on the sale said, we did not, the, the, the archives went along in the sale, but they were not given a value in fixing the price. Now, I understand what each of Your Honors has asked for, and I, and I hope I want to reserve just a little bit for rebuttal, and I'll try to address that, I guess, if I could reserve what remains.  Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Zia Modabber from Cap-Mewton-Roseman. I represent the appellee, the defendant here, Nicholas Klainos. I want to start by a comment my colleague, Ms. Cannata, made where she asked the and her answer was to completely skip any analysis of legal ownership. And I'm going to start with the copyrights. We know from our, the very beginnings of our knowing anything about the Copyright Act that the way you own a copyright is to create the actual work. That is the owner of the copyright. And we know Bill Graham did not create any of the poster artwork. From there, the only way Bill Graham individually, as opposed to Bill Graham, the 100 percent owner of all of the companies, the only way Bill Graham individually could own those copyrights is if there was an assignment to him, which we know does not exist, or if there was a work-for-hire. So our obligation here is to figure out whether or not, under the work-for-hire doctrine, as it's expressed in the statute in the Copyright Act, attributes ownership to Bill Graham individually. And we know that that test is the instance and expense test. The instance and expense test begins with, the first one, instance. What is the impetus for the creation of the artwork? The impetus for the creation of this artwork, without dispute, is to advertise concerts. That was the business of Bill Graham Presents. Those posters were not created to hang on the living room of Mr. Graham's home. They were created, and we know this because of what they included, there's artwork, it has the name of the band that was going to perform, the date of the performance, and the place of the performance. Those ads were placed all over the city to promote concerts. So the impetus for the creation, and therefore the instance test in this case, all point to ownership of the company. We have no burden on this issue, and it's important for all of us to remember that. We have no burden as an element of their claims for both conversion and breach of fiduciary duty. They must establish ownership, or at least a triable issue, on ownership. If I could turn to the expense test. Well, but that's what opposing counsel says, that the records do show a material issue of fact that Bill Graham had these posters, considered these posters to be his personal property, especially the ones that were left over after the promotion. So what's your response to the fact that there are declarations that he hired them, that he paid the artist to produce them? What's your response to whether or not that creates a triable issue of fact? My response is, and I believe the district court said it, is that there is no question that there is evidence of a work for hire arrangement here, but that doesn't answer the question. The question is, is it a work for hire where the employer for hire is Bill Graham the individual, or the employer for hire is Bill Graham as the president and 100 percent owner of these businesses? And because these assets were created for the business, the business is the owner, under the instance test. For the expense test, it's even clearer. There is not a shred of evidence that Bill Graham personally ever paid a dollar to any poster copyright artist. And what was troubling from the record is that we have known from the plaintiffs have known, the appellants have known from the beginning of this lawsuit, that the instance and expense test is at the crux of it. And yet when we get to that, what we have at summary judgment time is a declaration, ambiguous at best and evasive at worst, that Graham paid these poster artists. Well, Graham who? We know the person, Bill Graham, paid for them. We don't know whether he used corporate money or whether he used personal money. And we didn't learn that until on the eve of summary judgment, we are handed 1,700 pages of documents and surprise declarations from poster artists and Mr. Graham's former wife, Bonnie McLean, was one of those poster artists. And they submit these declarations ambiguously stating that Graham paid for it. We have the right to take the deposition. The district court gave us the right to belatedly take these depositions, and every one of these witnesses showed up and testified that they were paid with company checks. So here we are with the plaintiffs presenting to the district court evidence supposedly that Bill Graham, the person individually paid, while they are holding documents and information showing that the company is actually paid. What about these posters that were created before the company was incorporated? I mean, those couldn't have been paid with corporate funds, could they? No, they could not have been paid with corporate funds. But, again, we have no burden, and I believe there's eight of these poster copyrights that are an issue. There was no evidence that Bill Graham or anybody paid for them at all. And, again, it's not our burden. They have to come for every one of these posters. They have to, in our view, come forward with evidence that Bill Graham, the individual, paid for them. Who else would have paid for it if the company wasn't in existence? Who else would have paid for it? Maybe nobody paid for it. That's not a reasonable guess. But that wouldn't make them not works for hire. I mean, it could be instance or expense, right? So maybe there's no expense. If Bill Graham asked for posters and they were done pro bono, so to speak, it would still be part of his estate, wouldn't it? We need them both. It's not instance or expense. It's instance and expense. You have to create the impetus for their creation must be for the employer for hire, and the expense has to be paid by the employer for hire. But if the company doesn't exist, what would be the instance if they were created before the company existed? I understand on the instance component there is evidence, or at least that inference can be drawn, that it could not be for the company. For those eight posters, okay? But the expense test is where they fail. They still have to come up with evidence, and we aren't allowed to just speculate or assume. He could have paid for them eight months later when he formed the corporation. Make those posters for me, poster artist, please. And then eight months later in March of 1967 when he forms the company, then he pays for them. We don't know, but again, we don't have that burden. And it only speaks to eight of the poster copyrights. For the other, we think it's 174 because that was before the district court and the summary judgment motion. They say it's 300 and something because they tried to later after the hearing amend the record. That motion for reconsideration was denied. It has not been challenged here, so we don't even think there's anything at issue other than these 174. But no matter how many posters there are, for each and every one of them that's an issue, it is their burden to put into evidence some evidence that they were created at the expense of Bill Graham, the individual. And to the contrary, I believe we actually meet the burden of proving that all of them were paid for by the company. At least where there's evidence of any payment, every payment is by the company. There's another point that I'd like to make and it deals with, it touches on the damages and a number of these other issues that relate to conversion. Under Bill Graham's will, and we talk about this in our brief, there was no specific bequest of any personal property to the plaintiffs and appellants here. In other words, they are not entitled and have no ownership or legal claim to any particular item of anything. Not one poster, not one piece of clothing, not one anything. What they are entitled to is 27.5% of the estate. You can't cut posters up into 27.5% pieces. So the executor was well within his discretion to decide, as he did, we know, with respect to the scrapbooks, the actual scrapbooks, not the poster books, but the scrapbooks that had news clippings and articles. And we know that all that was actually paid for by the company. But Nicholas Klainos believed that Bill Graham, if he were alive, would want his children to have those. So he, in the exercise of his discretion, actually gave the scrapbooks to David Graham and Alex Graham. Not because they're legally entitled to it, they were not. And for that reason, they are not entitled either under a conversion claim or a breach of fiduciary duty claim to say, I want those copyrights. I don't want the money for them, which we know they got. I want the copyrights, I want the trademark, I want the posters. They have no right to that. Why was the assignment backdated? Backdated is a loaded term. Okay. Why was an August 1st date put on the assignment when it was actually executed at the end of August? Because, as Mr. Green and Mr. Pompili testified, after the sale happened, everybody had known since 1991 that these registrations were actually in Bill Graham's name. Yes, 1991, that they were in Bill Graham's name, but that they actually belonged to the company. We know that because Dick Green had a meeting and did the due diligence in 1991. His contemporaneous notes are in the record before this court. So that determination had been made back in 1991. By whom? By Mr. Green, the lawyer for the executor. Did that have been part of the probate proceedings? No, Your Honor. In 1995, when we believe it was the ministerial act of creating the assignment, that transaction where the assignment became part of was a transaction outside of the probate court. The probate court, the transaction that happened was simply the distribution of the shares of the companies. And because those companies owned those assets, necessarily the assets of the company, including the copyrights and all of that, were distributed to... The probate proceedings were to determine who owned the assets. And so I don't agree necessarily that it's ministerial to assign assets that should have been determined by the probate court. Well, at the time of the probate court proceedings, and if there was a mistake in attributing ownership between the company and Bill Graham individually, that is barred by the litigation privilege. The Ninth Circuit on our anti-slap motion already determined that... It's not barred if it was never brought to the probate court. The fraud, if they can prove fraud, and it's already been determined there was no fraud. There's no fraud claim left in this case. And so the privilege does, and res judicata, does apply to it. How can the privilege apply to something that was never adjudicated by the probate court? What happened, if there was a fraud claim left, and there is not... I'm not talking about the fraud claim. I'm talking about the assignment of the trademark and the copyrights. You're saying that it did not have to go through the probate court. And I'm asking you if it indeed was a part of the determination of who owned those and should have been before the probate court. Why isn't that issue preserved for the sons to now litigate? In 1991 is when the legal determination of ownership was made. It was made by Dick Green. The evidence is that it was done in good faith with nothing nefarious about it, and everybody acted in conformity with it all the way up and through and until 1995. It's only in 1995 that the assignment is created, which everybody stands up and says, Oh, my God, what have we done here? We've got an assignment, and we're now changing ownership of these assets. And the response is, there was no change in the ownership of the assets. Under the instance and expense test, Dick Green got it right in 1991. And it's still right today. Those copyrights and those assets were owned by the company back then, and they're owned by the company now. Unless there's any further questions, I did promise my co-counsel we were going to split time. You didn't tell us that. I'm sorry. I'm sorry. We did discuss it with Kirk. I apologize. May it please the Court. My name is Michael Elkin, counsel for the BGA appellees. Appellants seek to unwind a transaction occurring nearly a quarter of a century ago to recover assets that have been changed several times since. These assets were ones that the appellants declined to purchase after receiving millions of dollars in return for selling their shares of companies that cover these very assets. We think the district court decision on summary judgment in favor of our clients was correct. This was the counsel award, counsel fees award. The two arguments that we'd like to advance with respect to the merits appeal, one that, in fact, there was no ownership interest by the appellants has already been covered by counsel for Mr. Klainos, so I won't regurgitate those arguments. I would like to focus, if I may, on the innocent purchaser defense that was asserted and found in favor of our client at the district court level. As this court well knows, a purchaser who takes title without knowledge of defects cannot be required to turn over the property, and the record here is bereft of any facts creating any genuine issue of material fact that our clients were aware of any improprieties, any claimed improprieties at all. The one exception where potentially an innocent purchaser transaction can be upset is where the transaction is, in effect, void, where the property is actually stolen, which is not the case here. You have a color of authority of a fiduciary of a trustee for the claim debt officiaries. It was done. There are Supreme Court cases in California that cover this issue, the Ferrato case, the Conklin case. In fact, there is a specific probate section, 18,100, that covers situations like this where someone is actually protected, where they actually take title from the actual fiduciary himself. This is unlike the case that's been cited by the appellants, the Strasburg case, where you had someone who was not an executor, it was not an innocent purchaser defense that was asserted there. There was no discussion of void versus voidable. The deal issue here was consummated in 1994 by Klainos, who was acting as a fiduciary, and the assets changed hands many times. I just want to comment briefly, if I could, Judge Rawlinson, on the assignment issue. Our view is that we believe it was extraneous for the following reason. There was a sale of assets that occurred in 1994 by BG Enterprises to BG Presents. And the assets, the poster copyrights, the posters it issued, traveled with the sale. A determination was made it was impossible for any fiduciary to be able to account for everything in the estate with respect to the archives. There were literally hundreds of thousands of articles that had never been inventoried at all. The reason why the assignment we submit, frankly, is extraneous, if the Court were to go down that road, is that the purpose of the assignment is simply to put the world on notice as to who actually owns these copyrights. It didn't affect the transfer of the copyright interest themselves. I would note that the assignment at the time that it was executed, Mr. Klainos was still acting as a fiduciary for Alex, one of the two sons. The issue that they raise as well, the so-called the property must be exempt because it's personal to Bill Graham, something that related to an interview conducted of our client on TV. We submit that that really is a red herring. The whole concept of whether something is personal or not is relevant with respect to whether it was an exempt property that our client took from Clear Channel. And if you take a look at the record site 12 ER 234041, this is the retained assets or exemption language. And the language actually reads, items which Bill Sagan, which is one of the defendants here and owner of Norton, and a representative of the seller mutually agree in their reasonable judgment should not constitute an asset because such items are personal to individual employees or members of the Bill Graham family, et cetera. There's been no allegation, there is no proof there was ever any agreement by Mr. Sagan at all with regard to any sort of exempt property. If I could just turn very briefly to the legal fees issue, as the court well knows, there's an abuse of discretion standard. Fogarty factors were identified and decided by the district court. We don't think there's any question that the defense here furthered the interest of the copyright laws. What Norton did when it got these particular properties, they were kept in cold storage boxes with poor temperature. They were dusted off. They were put in a climatized environment. They were carefully curated and made available to the public on the various websites. In short, our client made available artistic works that had been basically languishing for a number of years. The other side makes an issue of the fact that somehow the district court judge erred when it awarded fees with respect to the non-copyright infringement claims. We think there's ample precedent in this circuit that related claims are compensable where you have as here core facts that relate to all claims. As the court well knows, in a copyright infringement action, there are two elements that have to be proved. One is copyright ownership. The second is copying. The copyright ownership issue all pertain to whether or not the appellants actually owned the assets as opposed to the estate, the Bill Graham Enterprises. Counsel, the only issue that somewhat concerned me is the travel expenses, since you wanted to discuss that. Why were the travel expenses reasonable in your view? They were reasonable, Your Honor, because, number one, Ms. Ranahan, who took most of the depositions, actually lives both in L.A. and in San Francisco, and so all of the collective travel expenses were less. There were some travel from New York by one of the partners, and the reason why it was considered to be high is because he happened to be traveling for the deposition at peak travel times. I believe it was in February. I can't account for it beyond that, but I think all of that was fully parsed by the district court and actually reflected in her decision. The we believe, in short, Your Honor, that the district court properly decided summary judgment in favor of Norton and awarded fees that the claims we submit were not meritorious, and the repeated efforts to undo successive transactions beginning some 25 years ago should be brought to a final rest. Thank you. Thank you, counsel. Your model. Thank you, Your Honor. I would like to return because I do not like to leave one of your questions unanswered on damage. There are disputed issues of fact on damage. I believe all of you asked me what, why, how do we know whether or not they were compensated as the assets potentially traveled with the corporation. The value of what was taken, the value of what was paid, those are disputed issues. They would have been the subject of expert testimony, which was in development at the time the summary judgment was heard. But we know that the assets, the copyrights were, there was an expert designated to testify about the value of the copyrights lost in excess of $2 million, not to mention the potential exploitation. The hundred sets, there was Rudy Franke, that is part of the record. He was an expert designated, believing that that asset was worth more than $9 million, which far exceeds any percentage that could be argued they were compensated for, if you consider their other valuable assets that they were selling. And finally, the poster scrapbooks. The district court seemed to agree that those were the personal property of Bill Graham. Those were not delivered. And but then said, applying the wrong standard, the wrong legal standard of conversion said that in absence of knowledge, the, that the conversion did not take place. That is not the legal standard. If you read the Oakdale case that the district court cited and that this court called to the district court's attention, I believe, in the earlier Ninth Circuit decision, that states that knowledge is ordinarily not relevant. It is a strict liability crime where you assert possession and control over the asset. Knowledge may be relevant for proving about that, that possession and control, but that would be it. I want to address a two, one other, a couple of small issues. The income and expense test. Your Honor, I think, Your Honors, I think that's the wrong lens through which to look at this, although there are plenty of disputed facts on that issue. We've laid it out carefully in the briefing. The lens is, it's agreed. It was a work for hire. The question is who, what hat was he wearing at the time that it occurred? There's no artist. The income and expense test becomes an issue if the artist is fighting with the person who commissioned the work. That's not happening here. All the artists that testified to the majority said, we've no problem. Bill Graham owned the copyright. So the issue, and we placed, he had copyrighted Bill Graham and registered in his name. Those create sufficient presumption and certainly sufficient disputed issues of fact to suggest that he owned the asset at the time of his death. It is not going to be the burden, and it should never have been the burden of plaintiff to prove what happened. If we have a video camera that can go back to 1965 and let's just put a window into every single transaction. All right. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. That completes our calendar for the day. We are on recess until 9 a.m. tomorrow morning.
judges: Rawlinson, Bybee, Smith